2574 Multimedia v. Playerlync Thank you, Your Honors. Good morning, and may it please the Court. Section 101 expansively makes eligible for a patent any new and useful process or machine, or any new and useful improvement thereof. Multimedia's 025 patent describes and claims just such a specific improvement in a machine, a learning management system, or LMS, and a specific improvement in a process for using an LMS for administering and tracking training of a dispersed workforce. In a nutshell, that specific improvement is the caching of a high and only transmitting low-bandwidth test information back to a central administrative server via a low-bandwidth connection in substantially real-time. Using conventional hardware and software... I'm reading this specification, and there's all kinds of things in here about, well, really the whole point of this is to have somebody put the test answers into a local computer and send them on. I mean, it says the training program can be on a DVD, a CD-ROM, and the employee can even write their answers on a piece of paper, and someone else can type them into the computer. How is that changing the computer technology? The paper embodiment that's described is actually not claimed in the claims, Your Honor. That would be one of the ways that one could not infringe this very specific LMS configuration. It was mentioned that it was not claimed. We also had claimed IVR, telephone telephony, as a possibility, as one of the ways that you could do this invention. There were claims to that. They were restricted out, and they're not in the patent, so that's another way that this... But even those discussions are indicative of how simple the concept is, right? The concept is simple, but it's still not abstract, though. If you give me a minute to go into the background of where we were technologically when this invention was created, it'll clear up why this is a technological solution to a technological problem. So at the time of the invention, very few retailers, and this is for retail training primarily, like a Coach or a Tiffany's or any store, any company that has lots of locations for retail or restaurants could be implicated. But back in 2004, very few retailers were connected to the Internet at all. The maximum connection speed back then was 128 kilobits per second, perhaps. Typically, a training program for training employees in what not to do with a shoplifter or what to do for workplace harassment was deployed on an in-store machine where a standalone LMS server was installed. An employee would log in locally on the server, which contained both training content and the test results. And then for corporate to see those results, typically the store manager would have to create a floppy disk and mail it to the corporate office. By the time the management had data to look at, it was old data, and it wasn't giving you a good sense of how the training is working. The other alternative at the time, back in 2004, was to have a central server and host the LMS at corporate HQ. Since the bandwidth was very limited, as we said, and that bandwidth had to include all of the available bandwidth used for credit card transactions and other mission-critical transactions, the available bandwidth didn't allow for video or audio. You had just low bandwidth content being streamed, which was text and images, very limited images. There was not engaging content at all. Employees just weren't getting it. So Multimedia's novel approach, and we argue non-abstract approach, was a hybrid of those two systems, best of both worlds. They maintained a central server with live test data, that's the low bandwidth information, but separated the high bandwidth content so it resided locally at the store. So Multimedia could deliver both an engaging and media-rich user experience and provide live data and metrics. So the high bandwidth information, that's the test itself? Yes. The low bandwidth information is the answers? Yes. So it's kind of like every year a bunch of high school kids have to take the SAT. They all get the big booklet and then they have a scan drawn and then they fill in the only the scan drawn sheets get sent back, right? I mean, that's, if I understand how the SAT test taking process works, what you're doing, it feels like the mere automation of that very process. Well, it's not just the automation of that process. It's the providing in the SAT or scan drawn hypothetical, there's no connection between the student and the central database. It's basically there's an air gap. You have to put your test answers on the scan drawn and they get mailed in. I mean, we all took the LSATs. We didn't find out for months until we got our results and apparently we all passed. But the result is that there's no low bandwidth connection and that's a specific claim structure in the claims that quite frankly, the district court ignored when it was doing its analysis. Why is that a technical achievement of some sort? Well, it's by itself, that's a conventional component. But in the context of an LMS, that by itself was a non-conventional arrangement of existing conventional components. Could you explain that a little more? Sure. An important aspect of the claim convention is that while the high bandwidth program resides on the local computer, only the employee's low bandwidth test information is transmitted back to the central server. And it's not just whenever, it's substantially as the employee is taking the test. Either it could be per by answer or it could be every time the employee logs in. But it's not months later and it's not on a floppy disk that's mailed in. So there's no air gap. And this non-conventional, non-generic arrangement of the components of an LMS and how they communicate with each other yields several advantages over what was previous LMSes. It enabled employees to access high bandwidth material without burdening the retail location's data line and possibly compromising its electronic commerce. It also enables an employee to interact with a high bandwidth program now in 2017 on a smartphone or a tablet on his or her own time, even if he or she is in a bad signal area like a subway stop or an airplane. And the invention additionally enables a manager to review the employee data as it comes in or reasonably fractal area. At the time this patent was issued, there was no concept of smartphones or smart data. That's exactly correct, Your Honor. The iPhone came out in 2007. But you're now saying that this whole method would read on all of those things. Well, it wouldn't read on all of it because there are other limitations in the claims. But when Apple introduced the iPhone in 2007 and then launched the App Store in 2008, which was all after the patent, it came to the same conclusion that multimedia did back in 2004, which is that performance is greatly improved when high bandwidth content is cached on a to the central or remote computer via a low bandwidth connection. But such a, you know, LMS, that technology didn't exist back in 2004 when they filed this application. And both sets of claims recite actual structural components and how they interact with each other in much greater specificity than just do it on a computer. And both sets of claims are directed to significantly more than the abstract idea of administering a test per se. So when we go to the two steps of the Alice test, you know, the first step are the claims directed to an abstract idea? No. They're directed to a specific improvement in LMSs, a specific technological area. And when we examine the claims as a whole, instead of the eviscerated claim that the district court examined, then we see that there's physical structural limitations that are more specific than just a computer. When we go to the, when we go to step two, we see that the claims recite meaningful limitations beyond generally linking the use of an abstract idea to a particular technological environment. And because of the specific distribution of functionality within the claimed LMS, all of the advantages I mentioned before of the invention are possible. And none of those were possible with prior LMSs. You know, this court has repeatedly held that moving around the functionality within a network of devices so that the network performs better is eligible subject matter. It did so in BASCOM when you move around the content filtering scheme from a local machine to a central machine while still maintaining customizable settings. That was deemed to be an inventive concept and eligible subject matter. The same thing in Amdocs. It was distributed architecture that minimized the impact on network system resources and enabled load distribution. That was... Are you saying that we have said in those cases that if all you do is rearrange the architecture, that's enough? That's not the only test, but... I think we have said just the opposite, that just rearranging data architecture is never enough. Right, but this is not just data architecture. It's actually hardware components, too. I the court held that inventive distribution of functionality within a network is patent eligible. It then went on to say in Electric Power that that's not happening in this case. It's happening if the claims hadn't moved around the functionality to make it perform better, then the claims might have been subject matter eligible. But in Electric Power, all it was doing was just looking at lots of data really quickly. Very similarly, in this case, the O2-5 patent moves a high-bandwidth training program to the local device. A low-bandwidth connection connects that local device to a central server and performance is improved greatly when high-bandwidth content is cached in the local device and only low-bandwidth test information is sent back to the central server. You're into your advice. I am, and I'm... Unless you have any questions, I can... Thank you. Sit down. May it please the court. I think as Your Honor, Judge Chen acknowledged, for decades, schools across the country have managed learning through standardized testing, where students are given a test booklet and an answer sheet. The teacher sits at the front of the class, watches the students take the test. Students put their name on the test, fill in the answers, and turn in the test sheet to the teacher. They transmit it to the teacher. The teacher can then grade the test manually or, with the Scantron, can submit it into a computer that spits out results. The teacher then sorts the results, grades the students. That's the analog that has been around since I've been alive, and puts it on the internet to make it faster. Your Honor asked whether a student could write down their answers and put it into the local computer. That's covered by the claims. If you look at Claim 1, it just says the student answers their answers on a local computer. It doesn't say it has to type them in. It could write them down, submit them in to a scanner, hit the send button, email them as an attachment, send them to the central server. That's within the scope of the claims. But taking a real-world analog and merely putting it on the internet, as the District Court found, is not patentable. The Supreme Court said so. This Court has repeatedly said so. It's just not patentable. And I think if you go back, my counsel talked about the background and why this is an improvement. The background section of the patent talks about presenting a CD-ROM to disparate locations. And the problem with that approach was, and it talked about segregating the answers and the tests in a contemporaneous quiz. And the employee would have to take the quiz and send it, either by email or however it got there, to a central server. And then all of the test data would have to be entered manually. That was a problem. This purports to solve that problem by having it entered on a local computer and transmitted over the internet. That's not sufficiently inventive. But if you look at the summary of the invention section, it talks about administering a test using computers. Well, let's look at the computers that it describes. It is a conventional client-server architecture with a communications link that is preferably a conventional internet connection. That is the technology we're talking about here. That predated, and everyone, I think, knows that predated 2004. The conventional client-server architecture, quote, an overview schematic of the inventive training system 10 is shown in figure 1. The main components of that are a computer and a central server. Let's talk about the conventional internet link between them. Each local computer can communicate with the central server via communication link 23. And that can be any type of communications link, but preferably one that's kind of a conventional internet connection. Now this notion that it's, he didn't touch an argument, but the notion that because there's a description of a system, a hosted learning management system, that all of a sudden makes it patentable. He didn't mention that, but in the briefing he does, and I just want to make clear that Alice specifically rejects that. You just can't give a name in the preamble, and all of a sudden it's patentable, and it dictates quite the opposite. But the argument that he focused on is that this is an improvement to prior LMS systems. And if you look at the notion of an LMS system, it's abstract in and of itself. Administering a test is a learning management system. But we also know that that's not true, because prior ways of doing it talks about segregating the test and the test questions, and we know that's been there throughout history. Or not history, but formal education, as long as I've lived. The alleged improvement of enabling a student to enter answers on the local computer, that's not inventive. That's merely typing in a computer or scanning something. So for example, if I have a test booklet on my desk, and I take the test and I email it to my teacher, that's within the scope of the claims. It's input on a local computer. Part of what they're claiming to be their invention is an LMS system that now uses a low bandwidth connection between the computer and the server, which is new and different than what happened before, which required a high bandwidth connection because of all of the information that was getting sent from the test takers back to the server. Now they've altered the architecture by now requiring a cheaper and therefore more convenient low bandwidth connection. I don't think they've changed the architecture. What they did is transmit the way they've transmitted the test program is via CD-ROM. It's not through the connection. It's on the server, but the background section, that's only one scenario that it talks about. It also talks about the other scenario of transmitting the test with the quiz to all of the employee sites through a CD-ROM and just typing in the answers using the conventional internet connection. They didn't change the internet connection. They didn't change the computer architecture. What they said is, we'll just transmit only the answers from a local computer to a server, and we're not going to stream the video program. That's not inventive. The interesting thing is I was listening to oral arguments of previous cases, and one of them is Williams that was recently argued. They made the opposite argument. They said the old way, and that was a computer learning management type of claims, a virtual classroom, where they took a virtual classroom and put it in a distributed internet. They made the argument, well, the prior way of doing it was mailing the CD and software to every local computer, and that was very problematic, and our improvement was doing it in a streaming fashion. The court rejected that. Also, you can't improve one abstract idea with another abstract idea. In this court, Affinity in the Amazon said streaming media is an abstract idea. It's not inventive. The fact that you're not doing one abstract idea, you're doing another, doesn't change the result here. Again, their alleged solution is entering the test answers on a local computer and transmitting them to a central server using generic computer architecture. That is not inventive, and it's merely taking a real-world analog. It's how we take tests. You take it on your desk, which is the analog to the computer. You write down your answers, and you transmit them to the teacher. A simpler real-world analog, which you can call that as an improvement over, is where a teacher stands in the front of the classroom and streams its questions and tests, and people raise their hands, and they have to respond. Well, that's a high-bandwidth problem for the teacher if it doesn't want to talk a lot. It just puts it in a book and puts it on the desk. But again, I think there can be no dispute that there's an abstract concept here. It's the idea of administering a test. That's the district court found, and all they did was put it on a computer architecture that was well-known. That's how the Internet worked. If you remember AOL, you got a CD in the late 90s or early 90s. You got a CD in the mail. You put it on your local computer, and you signed on, and you transmitted your unique identifier, your name, and other additional information answering questions of how you want your connection set up. But every time you communicated with the server, it didn't transmit the AOL program that sat on your local computer to the central server. The other alleged improvement that they talk about is enabling the manager to review in real time. That's not a technological improvement. That's the way the Internet works. You have a local computer. You send information to a central server. Another local computer can access it in real time. That's the cloud, and it's the way the Internet has worked at all times. And this court, the Supreme Court, has repeatedly said you can't take an abstract idea and implement it on a computer and say I have an invention. And the notion of, they said there was no claim construction and that there's these LMS definitions. If you look at the definitions they've provided, and they don't explain how that would change the result, the definitions actually are purely functional, and they don't explain how those definitions would change the result, which is required under this court's precedent, for example, in cyber phone. With that, I don't really have anything else. I'm happy to answer any questions. Thank you. Your Honors, I just wanted to use my remaining time to just outline some of the errors that the district court made. This court reviews eligibility questions de novo, but it's instructive to look at the errors that the district court made, of which there were several. Initially, regarding step one, the district court ignored the actual claim language and focused on the supposed purpose of the claims, and the claims were gutted of all of their actual structural limitations, and the eviscerated version of claim 12 was then examined. That appears on page 8 of the appendix. That's what the district court in Bascom did, and this court reversed that. That's the opposite of what one is supposed to do when reviewing claims for subject matter eligibility purposes. Instead, one is supposed to review the claims as a whole. And to my friend's point about that's what the Internet did, that's not really how AOL was working back in the 90s. AOL gave you executable code that you then set up on your computer, and then if you really wanted to get content, you still had to stream it, and if we all remember back in the 90s, it took a long time for it to be waiting for downloading to happen, because that was streaming the content. The district court also did not apply the inventive concept step correctly, because it failed to consider how the elements are arranged and how they interact. After the district court stripped the claims of all structural limitations, the district court went back to the structural limitations and indicated that each such limitation was merely a generic computer component. No thought was given as to how those components interacted and when they interacted, both of which are recited in the claims, and both of which provide an inventive concept. That's exactly what the district court did in Bascom, and this court reversed as it should here. Procedurally, the district court failed to resolve all factual disputes in favor of the non-moving party multimedia, which is required in a motion on the pleadings. It's not required in every case to do a claim construction, but here it is. In the cases that were cited by the district court, both of those, in those cases, they said no claim construction dispute is relevant to the eligibility issue. In IP Learn Focus, for example, not only was the basic character of the claim subject matter made the claim construction irrelevant, but the defendant was willing to agree with the patent holder's claim construction for the purposes of the summary judgment motion. We don't have any such agreement here. And relatedly, the district court ignored multimedia's preliminary evidence of what constitutes an LMS to one of ordinary skill in the art because it deemed that evidence as not being in the pleadings, and yet it relied on facts not only not in the pleadings but not in evidence and not even prior to the application itself by citing a smartphone app that came out five years after the 025 patent issued for a device that came out three years after the 025 patent's application was filed. For at least those reasons, the district court should be reversed and the claims found to recite eligible subject matter. I have nothing else. Do you have any questions? No. Thank you. Thank both parties and the cases submitted.